RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MATTHEW DICKSON, on behalf of himself and others
similarly situated,

          *Plaintiff-Appellant*,

    *v.*

DIRECT ENERGY, LP; TOTAL MARKETING CONCEPTS,
INC.; SILVERMAN ENTERPRISES, LLC,

          *Defendants-Appellees*.

No. 22-3394

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:18-cv-00182—John R. Adams, District Judge.

Argued: January 17, 2023

Decided and Filed: June 1, 2023

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brian K. Murphy, MURRAY MURPHY MOUL + BASIL LLP, Columbus, Ohio,
for Appellant. Michael D. Matthews, Jr., MCDOWELL HETHERINGTON LLP, Houston,
Texas, for Appellee Direct Energy, LP. **ON BRIEF:** Brian K. Murphy, Jonathan P. Misny,
MURRAY MURPHY MOUL + BASIL LLP, Columbus, Ohio, for Appellant. Michael D.
Matthews, Jr., William B. Thomas, Diane S. Wizig, David L. Villarreal, MCDOWELL
HETHERINGTON LLP, Houston, Texas, James M. Chambers, MCDOWELL
HETHERINGTON LLP, Arlington, Texas, for Appellee Direct Energy, LP.

———————————

**OPINION**

———————————

DAVIS, Circuit Judge.   Matthew Dickson brought this action under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, alleging that Direct Energy, LP sent him multiple ringless voicemails ("RVMs").   The district court determined that Dickson received only one RVM and dismissed the suit, finding that Dickson suffered no concrete harm and therefore lacked standing.   Dickson now appeals the order dismissing his claim.   We conclude that, regardless of the number of RVMs Dickson received, his asserted injury bears a close relationship to one recognized at common law.   We further find that Direct Energy caused Dickson precisely the type of harm Congress sought to address through the TCPA.   Accordingly, Dickson suffered a concrete injury for purposes of Article III standing.   We therefore **REVERSE** the order of the district court and **REMAND** for further proceedings.

**I**

The TCPA is the product of public outrage over abusive telephone marketing practices. Pub. L. 102-243 § 2, ¶ 6 (1991).   By the time it was enacted in 1991, companies had begun to use technology that could automatically dial telephone numbers and deliver prerecorded voice messages to potential consumers en masse—reportedly to more than 18 million Americans each day.   *Id.* ¶¶ 1, 3; *see also* S. Rep. No. 102–178, at 2 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1970 (describing industry developments which expanded the use of robocalls).   Many complained that these unsolicited calls tied up phone lines, crowded answering machines, imposed financial burdens, and disrupted public safety services.   Pub. L. 102-243 § 2, ¶¶ 5, 9, 14; S. Rep. No. 102–178, at 1–2, *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1969.   Consumers more generally criticized these robocalls as invasions of privacy "regardless of the content or the initiator of the message."   Pub. L. 102-243 § 2, ¶ 10.   Congress agreed.   It found that unrestricted telemarketing *can* be "an intrusive invasion of privacy."   *Id.* ¶ 5.   Congress thus enacted the TCPA with individual privacy interests among its primary concerns.   *Id.* ¶¶ 5, 9–10, 12; *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2348 (2020); S. Rep. No. 102–178, at 1–2, 4–5, 9, *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1968–69, 1972–73, 1976.

The TCPA accordingly restricts certain telemarketing practices. Among other things, it prohibits making any call, to any telephone number, "using any automatic telephone dialing system or an artificial or prerecorded voice" absent an emergency or the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). It similarly proscribes the use of robocalls to deliver unsolicited messages. *Id.* § 227(b)(1)(B). Congress delegated authority to the Federal Communications Commission to craft exceptions to the law, provided that those exceptions did not "adversely affect the privacy rights that [it] is intended to protect." *Id.* § 227(b)(2)(B)(ii)(I) (referring to subsection (b)(1)(B)); *see also id.* § 227(b)(2)(C) (stating essentially same in reference to subsection (b)(1)(A)(iii)). The TCPA includes a private right of action to enforce its provisions. *Id.* § 227(b)(3). The law contemplates both injunctive and monetary relief, allowing for an award of $500 for each violation of the statute with the possibility of recovering treble damages. *Id.*

## II

This case arises from unauthorized prerecorded messages allegedly sent to Dickson by Direct Energy. Specifically, Dickson alleges that Direct Energy delivered multiple RVMs to his cell phone in 2017 advertising its services. RVM technology makes it possible to "deposit[] voicemails directly into a recipient's voicemail box, without placing a traditional call to the recipient's wireless phone." One RVM placed on November 3, 2017, explicitly stated that the call was from "Nancy Brown with Direct Energy." Dickson never consented to receiving these communications. He thus filed suit individually and on behalf of all others similarly situated, alleging that Direct Energy violated the TCPA's automated calling prohibitions under 47 U.S.C. § 227(b)(1) by sending RVMs.[1] Dickson claims that he was harmed by these communications because they tied up his phone line, cost him money, and were generally a nuisance. He also maintains that the calls disturbed his solitude and invaded his privacy.

---

[1]Whether an RVM is a prohibited "call" under this section is not at issue here. But the magistrate judge in this case found that RVMs *are* "calls," explaining that "to hold otherwise 'would elevate form over substance, thwart Congressional intent that evolving technologies not deprive mobile consumers of the TCPA's protections, and potentially open a floodgate of unwanted voicemail messages to wireless consumers.'" In addition, the Federal Communications Commission recently issued a Declaratory Ruling and Order finding the same. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Petition for Declaratory Ruling of All About the Message, LLC*, No. 02-278, 2022 WL 17225556, at *1 ¶ 1, *3 ¶ 10, *4 ¶ 14 (Nov. 21, 2022).

Dickson's lawsuit proceeded to discovery.  At his deposition, Dickson testified that he received eleven RVMs from Direct Energy and reiterated that they invaded his privacy.  Regarding the November 3 RVM in particular, Dickson explained that he realized the voicemail was on his phone just a few minutes after receiving it.  While he could not remember precisely what he was doing when he received that message, he was "sure it interrupted something" in his routine.  Dickson also testified that he generally listened to every voicemail message he received from Direct Energy in its entirety.  Direct Energy retained an expert witness to analyze Dickson's phone records.  The expert concluded that of the eleven voicemails Dickson produced in discovery, only the one he received on November 3, 2017, was from Direct Energy.

Armed with this information, Direct Energy moved to dismiss Dickson's complaint for lack of standing, arguing that Dickson had suffered no concrete injury.  In granting the motion, the district court stated that Dickson received only one RVM—seemingly in reference to the November 3 voicemail.  The court held that Dickson's receipt of a single RVM did not constitute a concrete harm sufficient for Article III purposes because (a) he could not recall what he was doing when he received the RVM, (b) he was not charged for the RVM, (c) the RVM did not tie up his phone line, and (d) he spent an exceedingly small amount of time reviewing the RVM.  Dickson now appeals, arguing that the district court made erroneous findings of fact and misapplied the law.

**III**

We review *de novo* the district court's decision to grant Direct Energy's motion to dismiss for lack of subject matter jurisdiction.  *Lindke v. Tomlinson*, 31 F.4th 487, 490 (6th Cir. 2022) (quoting *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014)).  For the reasons set forth below, we conclude that the court erred in dismissing Dickson's TCPA claim for lack of standing.

**A.**

Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies.  U.S. Const. art. III, § 2.  An essential component of the case-or-controversy requirement is the doctrine of standing, which "limits the category of litigants empowered to

maintain a lawsuit in federal court to [those who] seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish standing, plaintiffs bear the burden of showing (1) a concrete and particularized injury-in-fact which (2) is traceable to the defendant's conduct and (3) can be redressed by a favorable judicial decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Spokeo*, 578 U.S. at 338 n.6.

This court has not previously considered whether receipt of a single RVM for commercial purposes presents a concrete harm sufficient to confer standing to make a claim under the TCPA.  Here, we find that Dickson's claims satisfy the demands of Article III because his alleged injury under the TCPA constitutes a concrete harm.

A concrete harm is one that is real and not abstract—*i.e.*, it "actually exist[s]."  *Spokeo*, 578 U.S. at 340.  A mere procedural violation of a statutory right does not amount to a concrete injury.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (quotation omitted).  Courts therefore must interrogate the concreteness requirement "even in the context of a[n alleged] statutory violation."  *Spokeo*, 578 U.S. at 341.  Notably, an injury need not necessarily be tangible (e.g., physical or monetary) to be concrete; intangible harms can create Article III standing.  *TransUnion*, 141 S. Ct. at 2204; *Spokeo*, 578 U.S. at 340.  And Congress's decision to create a statutory cause of action may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," so long as those injuries "'exist' in the real world."  *TransUnion*, 141 S. Ct. at 2205 (first quoting *Spokeo*, 578 U.S. at 341, then quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

To determine whether an intangible harm—such as Dickson's receipt of an unsolicited RVM—rises to the level of a concrete injury, courts may look to (1) history and tradition and (2) Congress's judgment in enacting the law at issue.  *TransUnion*, 141 S. Ct. at 2204–05; *Spokeo*, 578 U.S at 340.  These considerations are addressed in turn below.

**B.**

We first consider whether Dickson's asserted injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo*, 578 U.S. at 341 (citation omitted).  The Court has clarified, however, that

"*Spokeo* does not require an exact duplicate in American history and tradition." *TransUnion*, 141 S. Ct. at 2204.

Then-Judge Barrett's opinion in *Gadelhak v. AT&T Services, Inc.* is instructive on this requirement. 950 F.3d 458 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2552 (2021). In *Gadelhak*, the plaintiff brought suit under the TCPA after receiving five unwanted text messages from AT&T, the defendant telephone company. *Id.* at 460. The court began by reviewing, in light of *Spokeo*, whether the plaintiff had Article III standing to sue for this intangible harm. *Id.* at 461– 63. In analyzing whether sending unwanted texts resembled a tort at common law, the court looked to the common law tort of intrusion upon seclusion—a cause of action aimed at "defendants who invade[] the private solitude of another." *Id.* at 462 (citing Restatement (Second) of Torts § 652B (Am. L. Inst. 1977) [hereinafter Restatement]); *see also* Restatement § 652A(2)(a) (noting in part that intrusion-upon-seclusion claims vindicate people's "right to be let alone"). The court observed that this common law cause of action historically helped to address "irritating intrusions" into one's privacy, "such as when 'telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.'" *Gadelhak*, 950 F.3d at 462 (citing Restatement § 652B cmt. d). The court reasoned that when AT&T sent Gadelhak unsolicited text messages, it made a similar intrusion into his privacy or seclusion. *Id.* It did not matter that "common law courts generally require a much more substantial imposition—typically, many calls—to support liability for intrusion upon seclusion," because:

> when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a "close relationship" *in kind, not degree.* In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same *kind* of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.

*Id.* at 462–63 (first emphasis added) (quoting *Spokeo*, 578 U.S. at 341); *see also id.* at 463 n.2 (further explaining, in this same vein, that even a single TCPA violation, such as receipt of one

unwanted text, could suffice for Article III standing so long as that alleged harm fundamentally resembled a common-law tort).

*Gadelhak*'s approach is well-reasoned in view of the Supreme Court's guidance in *Spokeo* and *TransUnion*. We recently applied *Gadelhak* in a Fair Debt Collection Practices Act case where we determined that the plaintiff's receipt of one unwanted voicemail "is injury enough" to establish Article III standing because "[t]he intrusion caused by unwanted phone calls bears a 'close relationship' to the *kind* of harm" protected by common-law intrusion upon seclusion. *See Ward v. NPAS, Inc.*, 63 F.4th 576, 580–81 (6th Cir. 2023). In a similar vein, we recognized in *Norton v. Beasley* that "an intangible injury . . . generally suffices so long as it is the type of injury traditionally recognized by American courts," and that the relevant measure here "is one of kind and not degree." No. 21-6053, 2022 WL 17348385, at *7 (6th Cir. Dec. 1, 2022) (citations omitted). Other circuits apply similar (or identical) reasoning on this same point. *See, e.g.*, *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) (courts should "focus[] on types of harms protected at common law, not the precise point at which those harms become actionable" (citation omitted)); *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653–54 (4th Cir. 2019) (same); *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) (ruling plaintiff had standing because her claimed intangible harm resembled a common-law intrusion upon seclusion, regardless of whether she would prevail on a stand-alone claim for that common-law harm); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (one unsolicited call similar in kind to a common-law intrusion upon seclusion conferred standing); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351–52 (3d Cir. 2017) (same); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017) ("[T]he relevant point is that Congress has chosen to protect against a harm that is at least closely similar *in kind* to others that have traditionally served as the basis for lawsuit.").

In this case, Dickson argues that his receipt of an unwanted RVM resembled the common law tort of intrusion upon seclusion.**[2]** As explained above, courts at common law recognized

---

**[2]**In his reply brief, Dickson cursorily argues for the first time that Direct Energy's conduct also parallels the common-law tort of trespass to chattels. Because Dickson failed to appropriately develop this argument in his opening brief, it will not be addressed here. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (citing *Am. Trim,*

through this tort the "right to be let alone."   Restatement § 652A(2)(a), cmts. a–b; *see also TransUnion*, 141 S. Ct. at 2204 (citing *Gadelhak*, 950 F.3d at 462) (affirming that the tort of intrusion upon seclusion is deeply rooted in the common law).  And broadly speaking, unwanted telephone communications can qualify as injuries under this common law doctrine.  Restatement § 652B cmt d.

The kind of harm vindicated by the intrusion-upon-seclusion tort is relatively broad. Foundationally, there is a common-law right to privacy, which simply "reflects an individual's 'right to be let alone.'" *Fultz v. Gilliam*, 942 F.2d 396, 401 (6th Cir. 1991) (quoting Restatement § 652A cmt. A).  The intrusion-upon-seclusion tort derives from this generalized privacy interest, s*ee* Restatement § 652A & cmt. a, and it safeguards the right to be secluded from and undisturbed by the public.  *Fultz*, 942 F.2d at 401; *Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.3d 923, 924 (9th Cir. 2019); *see also* Restatement § 652B.  In other words, the common law recognizes concrete harm where a defendant "intrude[s] into the private solitude of another."  *E.g.*, *Lupia*, 8 F.4th at 1191; *see also Gadelhak*, 950 F.3d at 462; *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 801–02 (9th Cir. 2017).  This is the kind of harm with which the intrusion-upon-seclusion tort is concerned, at its core—the right to maintain a sense of solitude in one's life and private affairs.

That said, the *scope of liability* for the actual tort of intrusion upon seclusion is more circumscribed and confines liability to cases where a defendant's conduct is "highly offensive to the ordinary reasonable man."  Restatement § 652B cmt. d; *see also Charvat v. NMP, LLC*, 656 F.3d 440, 452–53 (6th Cir. 2011); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 291, 293 (3d Cir. 2016) (to state a legally cognizable claim for intrusion upon seclusion, one must show that the intrusion was highly offensive to a reasonable person).  A plaintiff's claims at common law thus may rise or fall based on the substantiality of the defendant's intrusions.

Here, Direct Energy placed an unsolicited call to Dickson's phone (the RVM) to publicize its services, interjecting itself into Dickson's private sphere.  This implicates Dickson's common-law right to seclusion—that is, his right to be left alone from others, including by

*L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived.").

means of telephonic communications. *Id.* §§ 652A, 652B. From a lay perspective, we can see why members of the public and Congress, through the TCPA, deemed such calls intrusive. Pub. L. 102-243 § 2, ¶¶ 5–6, 10, 12. For example, some consider their phone number a matter of private information in and of itself. People commonly exercise discretion in publicizing their phone numbers, entrusting them only to their circle of friends, family, and select others on an as-needed basis. It follows that they may not wish for strangers or unfamiliar businesses to directly reach their personal phone lines. In addition, phone numbers are relatively fixed and attached to the individual. In the ordinary course of things, they are seldom changed—which could make it difficult to evade unwanted communications once one's phone number is discovered. And finally, receipt of unwanted voicemails (for example) to a personal telephone also undermines a sense of privacy, because being prompted to consider such messages for review and then disposal is disruptive of one's personal time—particularly given that the recipient might forever be prompted to do so until it is done. In these ways and others, telephones are logically part of one's private domain to which the right to be left alone extends. *See* Restatement § 652A cmt. a.

This conclusion aligns with numerous decisions in which courts have found invasion-of-privacy-like harms flowing from unwanted telephonic communications. For example, in *Gadelhak*, the court found that receipt of a small number of unwanted text messages (or even *one* such text) is a "modern relative" of the intrusion-upon-seclusion tort. *Gadelhak*, 950 F.3d at 462, 463 n.2. In *Susinno*, the plaintiff similarly prevailed on evidence of a single prerecorded call. *Susinno*, 862 F.3d at 348, 351–52. And in *Van Patten*, the court observed that "[u]nsolicited . . . phone calls or text messages, *by their nature*, invade the privacy and disturb the solitude of their recipients." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (emphasis added). The Ninth Circuit recently reaffirmed that holding, explaining that receipt of unsolicited phone calls closely resembles traditional claims for intrusion upon seclusion. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 (9th Cir. 2022). Again, it is immaterial that an independent common-law cause of action for intrusion upon seclusion requires evidence of calls "repeated with such persistence and frequency" amounting to "hounding" of the plaintiff. *See* Restatement § 652B cmt. d. That is because in measuring concreteness, the inquiry centers on the *kind* of harm at issue rather than the *degree* of that harm. *E.g.*, *Gadelhak*, 950 F.3d at 462–63. And here, Dickson's alleged injury—namely, that Direct

Energy disturbed his right to be left alone—is closely related to the *kind* of harm protected at common law by the intrusion-upon-seclusion tort. Thus, the first prong of the post-*Spokeo* and *TransUnion* standing inquiry is satisfied.

The district court here relied on Eleventh Circuit case law in granting Direct Energy's motion to dismiss. *See Grigorian v. FCA US LLC*, 838 F. App'x 390 (11th Cir. 2020); *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019). We diverge from those non-binding decisions. First, both cases predate *TransUnion*, where the Court clarified *Spokeo*'s standing requirements. *TransUnion*, 141 S. Ct. at 2204–07. And second, *Grigorian* and *Salcedo* do not adequately address the historical-analogue prong.

In *Grigorian*, the defendant allegedly violated the TCPA by transmitting one RVM to the plaintiff's cell phone.[3] 838 F. App'x at 391. The Eleventh Circuit affirmed the district court's dismissal of the plaintiff's claims for lack of Article III standing. *Id.* But *Grigorian* did not conduct the standing inquiry required by *Spokeo*. *Id.* at 392–94; *see* 578 U.S. at 341 (instructing courts to look to both history and the judgment of Congress to determine whether an intangible harm is sufficiently concrete to constitute an injury in fact). This omission leaves a gap in reasoning that greatly diminishes *Grigorian*'s persuasive value here.

And in *Salcedo*, the court found the plaintiff lacked standing where he received an unsolicited text in violation of the TCPA. 936 F.3d at 1165, 1172. But *Salcedo* seems to misapply *Spokeo* in reasoning that intrusion upon seclusion requires evidence of a *substantial* intrusion, and the plaintiff's "isolated," "momentary" injury fell short of that standard; therefore, the plaintiff lacked a historical analogue to his claimed harm. *Id.* at 1171 (citing Restatement § 652B cmt. d). We do not agree that this approach is an appropriate measure of concreteness, however, because it requires the plaintiff to show that his harms would suffice to state an independent claim at common law—a prerequisite which *TransUnion* has since unequivocally clarified is *not* the applicable standard. 141 S. Ct. at 2204 ("*Spokeo* does not require an exact duplicate in American history and tradition."). Instead, as *Gadelhak* and many other courts have observed, *Spokeo* requires a close common-law analogue in *kind*, not *degree*. 950 F.3d at 462.

---

[3]*Grigorian* appears to be the only circuit court decision to date addressing whether receipt of an RVM can create Article III standing.

*Salcedo* also found that the plaintiff's alleged injury was insufficient because, traditionally, intrusions upon seclusion specifically entailed conduct like eavesdropping and wiretapping. 936 F.3d at 1171 (citing Restatement § 652B cmt. b). It opined that these "severe kinds of actively intermeddling intrusions" were nothing like Salcedo's receipt of an unwanted phone communication. *Id.* Yet the common-law tort *does* protect against invasive telephone contacts. Restatement § 652B cmt. d. As a result, other courts have expressly declined to follow *Salcedo*. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 693 (5th Cir. 2021) (rejecting *Salcedo* because its "focus on the substantiality of the harm in receiving a single text misunderstands *Spokeo*"); *Gadelhak*, 950 F.3d at 462–63 (explaining same and adopting the kind-versus-degree inquiry). We do the same.

For its part, Direct Energy insists that any harm Dickson may have personally suffered is insufficiently analogous to the tort of intrusion upon seclusion to state a claim. However, its arguments are unpersuasive. First, Direct Energy argues that "there is no evidence that [Dickson] was in a private place [e.g., his home] or state of seclusion that could have been intruded upon." Thus, because he was "not then in seclusion" when he noticed the RVM, there was no invasion of privacy. This argument is inapt. Intrusion upon seclusion occurs when someone "intrude[s] into a private place." Restatement § 652B cmt. c. Such an invasion of privacy can occur even when the victim is physically present in a public place. *Id.* Indeed, even outside the home, "there may be some matters about the plaintiff . . . that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters." *Id.* Direct Energy similarly invaded Dickson's private sphere when it placed an unsolicited, prerecorded call to his cell phone. *See, e.g.*, *Gadelhak*, 950 F.3d at 462; *Susinno*, 862 F.3d at 351–52. And cell phones are, by their nature, private—regardless of whether they are carried in public places. *See Riley v. California*, 573 U.S. 373, 393–97 (2014) (discussing the "broad array" of private information stored on cell phones, including extensive records of phone communications, photos, and other indicia of an individual's "private interests [and] concerns").

Direct Energy offers no authority for its postulation that Dickson must present proof of any further indicia of privacy (*e.g.*, that he was at home when he received the RVM). Moreover, other courts have determined that plaintiffs had standing to sue after receiving unsolicited

communications to their cell phones by analogizing that harm to intrusion upon seclusion—without requiring plaintiffs to be physically located in a special, private location when they received those unwanted communications.  *See, e.g.*, *Gadelhak*, 950 F.3d at 462–63; *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92–93 (2d Cir. 2019); *Susinno*, 862 F.3d at 351–52.  Nor do the TCPA's prohibitions appear to be so narrow.  *E.g.*, *Barr*, 140 S. Ct. at 2343–44, 2344 n.1, 2356 (explaining that "Congress enacted a general restriction on robocalls to cell phones" and that the TCPA "generally prohibits robocalls to cell phones *and* home phones" (emphasis added)).  Direct Energy fails to grapple with these authorities, and we therefore reject its suggestion to limit the scope of privacy.

Second, Direct Energy contends that an intrusion upon seclusion occurs only when a person's "peace and quiet" is disturbed by an audible sound like a ringing phone, or when a person's attention is otherwise taken away from what they are doing.  By this measure, it argues that Dickson's solitude was never intruded upon since the RVM was silently delivered to his phone.  That is to say: because Dickson's phone never buzzed or emitted a sound upon receipt of the RVM, and he did not notice it for several minutes, the RVM did not invade his privacy.  Direct Energy underscores that the RVM "sat unnoticed until Mr. Dickson voluntarily decided to turn his attention away from what he was doing to review his notifications."  It maintains that these facts are different in kind from the telephonic invasions of privacy recognized at common law which involve the ringing of a landline phone that cannot be ignored.  This reasoning closely resembles the *Salcedo* court's rationale that we reject here.  936 F.3d at 1172 (dismissing case for lack of standing because plaintiff "ha[d] not alleged anything like enjoying dinner at home with his family and having the domestic peace shattered by the ringing of the telephone").  Ultimately, Direct Energy suggests that no intrusion upon seclusion occurred here because its RVMs were relatively unobtrusive.

Like the suggestion that one RVM is not enough to intrude upon one's seclusion, however, this argument also challenges the *degree* of Dickson's harm.  As we previously explained, and as counsel for Direct Energy conceded at oral argument, the decisive issue here is whether Dickson's claimed injury is similar in *kind* to one recognized at common law.  We pause to disentangle these concepts as they pertain to this case.

Direct Energy asserts that Dickson's claim is unlike a tortious invasion of privacy because his "peace and quiet was [not] shattered by ringing phones or dinging text notifications." Yet Dickson need not make out a claim for tortious invasion of privacy for purposes of our analysis. Indeed, it could be that Dickson's claims would fail at common law for the reason Direct Energy offers, which is an issue we have no cause to decide. As pertinent here, the indicia of harm Direct Energy seeks to challenge—*i.e.*, how substantial or disruptive the defendant's conduct was—are matters of *degree*. They are irrelevant to the question of whether Dickson's claimed harm is similar *in kind* to an intrusion into his private affairs. *Gadelhak*, 950 F.3d at 462–63; *see also, e.g.*, *Perez*, 45 F.4th at 822; *Persinger*, 20 F.4th at 1192; *Lupia*, 8 F.4th at 1192; *Cranor*, 998 F.3d at 693; *Krakauer*, 925 F.3d at 654. Dickson suffered such a harm when Direct Energy deposited an unsolicited RVM into his phone. Therefore, Direct Energy's argument fails.

In conclusion, we find that Dickson has alleged an intangible harm that bears a sufficiently close relationship to the traditional common law tort of intrusion upon seclusion.

## C.

Next, we turn to Congress's judgment. In *Spokeo*, the Supreme Court observed that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," and so found its judgment "instructive and important" in determining whether an intangible harm rises to an injury in fact. *Spokeo*, 578 U.S. at 341; *see also TransUnion*, 141 S. Ct. at 2204–05 (adding that Congress is empowered to identify concrete harms that are inadequate in law and recognize them, by statute, as legally cognizable injuries). Courts accordingly "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 141 S. Ct. at 2204 (citation omitted). We thus review for whether a defendant's alleged misconduct aligns with the conduct Congress sought to regulate through federal law. *E.g.*, *Lupia*, 8 F.4th at 1192 (Congressional-judgment prong satisfied where defendant allegedly caused the specific kind of harm prohibited by the relevant statute); *Gadelhak*, 950 F.3d at 462 (same where plaintiff claimed he suffered "the very harm that the [TCPA] is designed to prevent").

The parties did not develop arguments on this point, so it appears not to be in dispute. In any event, Congress enacted the TCPA after finding that unrestricted telemarketing practices harm consumers. Pub. L. 102-243 § 2, ¶ 5. The law is intended to protect from invasions of privacy wrought by unauthorized automated and prerecorded calls. *Id.* ¶¶ 10, 12–14; *see also, e.g.*, *Yahoo! Inc.*, 913 F.3d at 925 ("The TCPA's explicit purpose 'is to protect privacy rights.'" (quoting *L.A. Lakers, Inc.*, 869 F.3d at 803)); *Cranor*, 998 F.3d at 690; *Gadelhak*, 950 F.3d at 460; *Krakauer*, 925 F.3d at 650; *Melito*, 923 F.3d at 88; *Parchman v. SLM Corp.*, 896 F.3d 728, 738–39 (6th Cir. 2018). Here, Dickson alleges that he received such an unsolicited marketing call from Direct Energy: the November 3 RVM. He also validly maintains that receipt of this message invaded his privacy. His injury therefore falls within the ambit of what Congress deemed to be an actionable harm when it enacted the TCPA. *See Gadelhak*, 950 F.3d at 462 (concluding same); *Melito*, 923 F.3d at 93 (same); *Susinno*, 862 F.3d at 351–52 (same). Accordingly, Dickson satisfies the second prong of our standing inquiry.

**D.**

Both prongs of the standing analysis set forth in *Spokeo* and *TransUnion* are satisfied here: Dickson's receipt of an unsolicited RVM bears a close relationship to the kind of injury protected by the common law tort of intrusion upon seclusion; and his claimed harm directly correlates with the protections enshrined by Congress in the TCPA. Therefore, Dickson suffered a concrete injury in fact sufficient for Article III standing purposes. Because the district court erred in dismissing Dickson's suit for want of standing, we reverse its judgment and remand for further consideration.

We address a few final points. First, Dickson argues that dismissal was improper under the law-of-the-case doctrine because the magistrate judge had previously found that RVMs are considered "calls" within the meaning of the TCPA. This argument misses the mark. Law of the case does not apply here because the magistrate judge's order at issue did not rule on Article III standing. Moreover, this doctrine has no applicability to rulings on subject-matter jurisdiction, which courts may revisit at any time. *Clark v. Adams*, 300 F. App'x 344, 351 (6th Cir. 2008) (quoting *Amen v. City of Dearborn*, 718 F.2d 789, 794 (6th Cir. 1983)). Second, because we find that Dickson has standing regardless of the number of RVMs he received, we need not address

his argument that the district court erred in finding that he received only one RVM from Direct Energy.  Whether he received one RVM or eleven (as he urges us to conclude), our standing analysis remains the same.

Finally, we decline Dickson's request for reassignment to a different judge on remand. This is another issue that was not properly presented to the court; it is raised for the first time in Dickson's reply brief.  *Sanborn*, 629 F.3d at 579.  In any case, Dickson failed to establish why this extraordinary remedy would be appropriate here.  *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532–33 (6th Cir. 2012) (quoting *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir. 2006)).  He asserts that the district judge cannot fairly preside over these claims because he construed "a situation in which literally millions of illegal telemarketing calls were delivered to hundreds of thousands of putative class members" as "unworthy of having a place on [his] docket."  The district court, however, properly inquired into *Dickson's* standing to bring suit based on the harms *he* claimed to have suffered.  There is no reason to believe that the district court will have "substantial difficulty" setting aside its previous finding (that Dickson suffered no concrete harm) on remand and in keeping with our ruling here.  *Renal Care Grp.*, 696 F.3d at 532–33 (quoting *Solomon*, 467 F.3d at 935).

## IV

For the foregoing reasons, we **REVERSE** the district court's dismissal of Dickson's suit for failure to demonstrate an injury in fact and **REMAND** for further proceedings.